**No. 26-11307**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

FIDELITY NATIONAL FINANCIAL, INC.; and FIDELITY NATIONAL TITLE INSURANCE COMPANY,

Plaintiffs-Appellants,

v.

SECRETARY, U.S. DEPARTMENT OF THE TREASURY; U.S. DEPARTMENT OF THE TREASURY; DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK; and THE FINANCIAL CRIMES ENFORCEMENT NETWORK,

Defendants-Appellees.

On Appeal from the United States District Court
for the Middle District of Florida

# BRIEF FOR APPELLEES


*Of Counsel:*

JONATHAN BRESSLER
*Assistant General Counsel for Enforcement and Intelligence*

CAITLIN COTTINGHAM
*Principal Deputy Assistant General Counsel for Enforcement and Intelligence*

SEAN BOYCE
*Chief Counsel for the Financial Crimes Enforcement Network*

*U.S. Department of the Treasury*

BRETT A. SHUMATE
*Assistant Attorney General*

GREGORY W. KEHOE
*United States Attorney*

BRAD HINSHELWOOD
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4214*

**AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Eleventh Circuit Rule 26.1-1, undersigned counsel certifies that, in addition to the persons identified in plaintiffs-appellants' certificate of interested persons (Doc. 3), defendants-appellees' certificate of interested persons (Doc. 13), and Puerto Rico Privacy Association, Inc.'s certificate of interested persons (Doc. 34), the following persons have an interest in the outcome of this appeal:

Boyce, Sean (Attorney for Defendants-Appellees)

Bressler, Jonathan (Attorney for Defendants-Appellees)

Cottingham, Catlin (Attorney for Defendants-Appellees)

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests oral argument. The U.S. District Court for the Eastern District of Texas has issued a decision that conflicts with the final judgment here, and the federal government has appealed the Texas decision to the U.S. Court of Appeals for the Fifth Circuit. The government believes that oral argument will be of substantial benefit to this Court in understanding the important issues in this case.

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 3

STATEMENT OF THE ISSUES ..... 3

STATEMENT OF THE CASE ..... 4

- A. Statutory Background ..... 4
- B. Factual Background ..... 6
- C. Prior Proceedings ..... 10
- D. Standard of Review ..... 14

SUMMARY OF ARGUMENT ..... 14

ARGUMENT ..... 17

I. FinCEN Had Statutory Authority to Promulgate the Final Rule ..... 17

- A. The Final Rule Requires Reporting for "Suspicious Transactions," as Authorized in § 5318(g)(1) ..... 18
- B. The Final Rule Requires Reporting that Guards Against Illicit Financing, as Authorized in § 5318(a)(2) ..... 30
- C. The Major-Questions Doctrine is Irrelevant Here ..... 37

II. The Final Rule Is Not Arbitrary and Capricious ..... 38

III. The Final Rule Is Consistent with the Fourth Amendment ..... 49

CONCLUSION ..... 53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alabama Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) (per curiam) ........ 16, 37-38

*Atlantic Richfield Co. v. Christian*,
590 U.S. 1 (2020) ........ 38

*Barry v. City of New York*,
712 F.2d 1554 (2d Cir. 1983) ........ 50-51

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........ 38

*Bloate v. United States*,
559 U.S. 196 (2010) ........ 33

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ........ 32

**California Bankers Ass'n v. Shultz*,
416 U.S. 21 (1974) ........ 3, 4, 12, 14, 16-17, 17-18, 21, 49-52

*Catalyst Pharms., Inc. v. Becerra*,
14 F.4th 1299 (11th Cir. 2021) ........ 48

*Center for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025) (per curiam) ........ 44-45

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........ 47

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........ 16, 38

*Fischer v. United States*,
603 U.S. 480 (2024) ........ 36

*Florida Manufactured Hous. Ass'n v. Cisneros*,
53 F.3d 1565 (11th Cir. 1995) ........ 44-45, 47

*Flowers Title Cos. v. Bessent*,
826 F. Supp. 3d 813 (E.D. Tex. 2026) ........ 20, 42

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) ........ 18

*Garland v. Ming Dai*,
593 U.S. 357 (2021) ........ 32

*High Point, LLLP v. NPS*,
850 F.3d 1185 (11th Cir. 2017) ........ 14

*Huawei Techs. USA, Inc. v. FCC*,
2 F.4th 421 (5th Cir. 2021) ........ 47

*INS v. Aguirre-Aguirre*,
526 U.S. 415 (1999) ........ 32

*Investment Co. Inst. v. CFTC*,
720 F.3d 370 (D.C. Cir. 2013) ........ 47

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ........ 49

*Lopez-Martinez v. U.S. Att'y Gen.*,
149 F.4th 1202 (11th Cir. 2025) ........ 48-49

*Michigan v. EPA*,
576 U.S. 743 (2015) ........ 45

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 39, 43

*National Mining Ass'n v. United Steel Workers*,
985 F.3d 1309 (11th Cir. 2021) ........ 43

*National Small Bus. United v. U.S. Dep't of the Treasury*,
161 F.4th 1323 (11th Cir. 2025) ........ 51

*Novedades Y Servicios, Inc. v. Financial Crimes Enforcement Network*,
181 F.4th 961 (9th Cir. 2026) ........ 47

*Lopez v. First Union National Bank of Florida*,
129 F.3d 1186 (11th Cir. 1997) ........ 28-29

*Overstreet v. Lexington-Fayette Urban County Government*,
305 F.3d 566 (6th Cir. 2002) ........ 50

*Ratzlaf v. United States*,
510 U.S. 135 (1994) .................... 4

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .................... 11, 32

*Stone v. INS*,
514 U.S. 386 (1995) .................... 35

*Sweet Additions Ingredient Processors, LLC v. Meelunie Am., Inc.*,
139 F.4th 1217 (11th Cir. 2025) (per curiam) .................... 35

*United States v. Bittner*,
19 F.4th 734 (5th Cir. 2021) .................... 36

*United States v. Fernandez*,
559 F.3d 303 (5th Cir. 2009) .................... 24-25

*United States v. Hansen*,
599 U.S. 762 (2023) .................... 34

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) .................... 50

*West Virginia v. EPA*,
597 U.S. 697 (2022) .................... 38

**Statutes**

Annunzio-Wylie Anti-Money Laundering Act,
Pub. L. No. 102-550, 106 Stat. 4044 (1992) .................... 5, 34

Anti-Money Laundering Act of 2020,
Pub. L. No. 116-283, 134 Stat. 4547 (2021) .................... 5, 34

Currency and Foreign Transactions Reporting Act,
Pub. L. No. 91-508, 84 Stat. 1118 (1970) .................... 5, 34

5 U.S.C. § 706 .................... 3, 14

8 U.S.C. § 1324a .................... 50

26 U.S.C. § 6012 .................... 50

26 U.S.C. § 6031-60 .................... 50

26 U.S.C. § 6050I .................... 50

28 U.S.C. § 1291 .................... 3

28 U.S.C. § 1331 ........................................................................................................ 3
28 U.S.C. § 1346 ........................................................................................................ 3
31 U.S.C. § 5311 ................................................................................................. 4, 44
31 U.S.C. § 5312 ................................................................................................. 4, 31
31 U.S.C. § 5313 ................................................................................................ 49-50
31 U.S.C. § 5314 ................................................................................................ 36, 50
31 U.S.C. § 5318 ..................................................................5, 19, 21, 28-29, 37, 44
*31 U.S.C. § 5318(a)(2) ...................................................2-3, 5, 8, 11-15, 30-38, 43
*31 U.S.C. § 5318(g)(1)....................1, 3, 4, 8, 10-11, 13-14, 18-19, 25, 29, 37, 38, 43, 44
31 U.S.C. § 5326 ......................................................................................... 9, 13, 24, 37
52 U.S.C. § 30104 ...................................................................................................... 50

**Administrative Materials**

Anti-Money Laundering Regulations for Residential Real Estate Transfers,
89 Fed. Reg. 12,424, 12,436 (Feb. 16, 2024) ...................................................... 22, 32

*Anti-Money Laundering Regulations for Residential Real Estate Transfers,
89 Fed. Reg. 70,258 (Aug. 29, 2024) .........1, 6-9, 17, 20-25, 28, 32, 39, 43, 45-46, 51

Treas. Order 180-01 (July 1, 2014) .................................................................................6
31 C.F.R. § 103.22 (1974) ............................................................................................ 49
31 C.F.R. § 1010.311 .................................................................................................... 49
31 C.F.R. § 1020.320 ............................................................................................. 26-27
31 C.F.R. § 1031.320.............................................................................................7-8, 40

**Other Authorities**

FinCEN, U.S. Dep't of the Treasury, *Suspicious Activity Report* (Feb. 2025).......................8

FinCEN, U.S. Dep't of the Treasury, *Year in Review for Fiscal Year 2024* .........................41

*Procedure*, Black's Law Dictionary (12th ed. 2024), Westlaw ..........................................33

*Procedure*, Oxford English Dictionary (2d ed. 1989) .........................................................33

*Suspicion*, Black's Law Dictionary (6th ed. 1990) .............................................................18

*Suspicion*, Oxford English Dictionary (2d ed. 1989) ........................................................18

*Suspicion*, Webster's New International Dictionary (3d ed. 1976) .............................18-19

*Suspicious*, Oxford English Dictionary (2d ed. 1989) .......................................................18

*Suspicious*, Webster's New International Dictionary (3d ed. 1976) .................................18

## INTRODUCTION

In 2024, the Financial Crimes Enforcement Network (FinCEN) promulgated a rule designed to combat money laundering and the financing of terrorism. Anti-Money Laundering Regulations for Residential Real Estate Transfers, 89 Fed. Reg. 70,258 (Aug. 29, 2024) (Final Rule or Rule). The Rule addresses a narrow class of high-risk transactions—certain non-financed transfers of residential real estate to a legal entity or trust. Those transactions are atypical and ripe for abuse. Ordinarily, residential real estate deals involve financing, like a mortgage loan from a bank that is subject to anti-money laundering requirements. When a criminal forgoes financing, *e.g.*, purchasing a single-family home in cash, he can skirt these protections. And by hiding behind a legal entity, that criminal can further obscure his identity. FinCEN cited evidence from its experience and engagement with law enforcement that transactions of this sort are especially attractive to drug cartels, human traffickers, corrupt foreign officials, and other nefarious actors seeking to launder funds in ways that are difficult to detect and trace. The Rule here thus requires the reporting of certain information about these high-risk transactions to FinCEN, which the agency has explained will help law enforcement connect illicit transactions to criminals.

The district court correctly held that the Final Rule is separately authorized by two different statutes. The first authorizes FinCEN to "require any financial institution" to "report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). As the court correctly recognized, a transaction

is "suspicious" if it raises the specter of illegal activity, even if that transaction is ultimately lawful. Dkt. 82, at 17.[1] And, as FinCEN explained in detail, the unique features of these transactions, as well as their repeated use by drug cartels, corrupt foreign officials, and other malfeasants to launder funds, underscore that transactions bearing these characteristics raise a suspicion of illegal activity.

The second statute authorizes FinCEN to require "a class of domestic financial institutions" to "maintain appropriate procedures, including the collection and reporting of certain information" to "guard against money laundering, the financing of terrorism, or other forms of illicit finance." 31 U.S.C. § 5318(a)(2). The Final Rule requires a class of institutions to "report[] ... certain information" about transactions ripe for abuse by money launderers, falling within § 5318(a)(2)'s plain text. Fidelity can argue otherwise only by rewriting this language to effectively excise Congress's specific reference to the power to require "the collection and reporting of certain information," rendering meaningless congressional amendments to the statute that added that language.

The district court also properly rejected a host of other arguments. The full scope of the record FinCEN assembled, including data from similar smaller-scale reporting requirements that generated valuable law enforcement information, belies any claim that FinCEN failed to establish that the transactions at issue here are suspicious.

[1] Citations of this form refer to docket entries in the district court record, following ECF pagination.

Moreover, FinCEN addressed in detail the burdens and benefits of its Final Rule—explaining how the benefits, though immeasurable, would be substantial and justify the burdens of compliance. And the reporting requirement here fits within a long tradition of requiring "organizations engaged in commerce" to "file reports dealing with particular phases of their activities," presenting no Fourth Amendment concerns. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 30, 65 (1974).

## STATEMENT OF JURISDICTION

Fidelity invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1346. Dkt. 1, at 7-8. The district court granted summary judgment for the federal government on February 19, 2026, and entered a final judgment on February 20, 2026. Dkts. 91-92. Fidelity noticed this appeal on April 17, 2026. Dkt. 94; *see* Fed. R. App. P. 4(a)(1)(B) (60-day limit). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**I.** Whether the district court correctly held that FinCEN had statutory authority to promulgate the Rule under 31 U.S.C. § 5318(g)(1) or 31 U.S.C. § 5318(a)(2).

**II.** Whether the district court correctly held that the Rule is not arbitrary or capricious. *See* 5 U.S.C. § 706(2)(A).

**III.** Whether the district court correctly held that the Rule is consistent with the Fourth Amendment.

## STATEMENT OF THE CASE

### A. Statutory Background

In 1970, Congress enacted the Currency and Foreign Transactions Reporting Act, which (as amended and with other statutes) is generally called the "Bank Secrecy Act" (BSA). *See Ratzlaf v. United States*, 510 U.S. 135, 138 (1994). That enactment followed "extensive hearings" in which Congress identified a problem: "the unavailability of foreign and domestic bank records" for suspected criminals. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974). As part of its response, Congress provided for the creation of "certain reports" that would be "highly useful" in combating crime. 31 U.S.C. § 5311(1). It specified the nature of some reports, *id.* § 5312, but generally left implementation of its directive to the Secretary of the Treasury (Secretary), *see, e.g.*, *id.* § 5318(a).

Through the Act and subsequent amendments, Congress conferred a significant "sweep of ... authority" on the Secretary. *See Shultz*, 416 U.S. at 30. Two aspects of that authority are relevant here, both relating to reporting by "financial institution[s]"—a category including "persons involved in real estate closings and settlements." 31 U.S.C. § 5312(a)(2)(U).

The first provision authorizes the Secretary to require "any financial institution" to "report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). Those reports are then made available to "any

appropriate law enforcement, supervisory agency, or United States intelligence agency" for use in combating financial crime and terrorism. *Id.* § 5318(g)(4)(B).

The second provision similarly allows the Secretary to help combat financial crime. *See* 31 U.S.C. § 5318(a)(2). Congress authorized the Secretary to require "a class of domestic financial institutions" to "maintain appropriate procedures," including "the collection and reporting of certain information." *Id.* He may exercise that authority in two circumstances—either to "ensure compliance" with certain BSA provisions or to "guard against money laundering, the financing of terrorism, or other forms of illicit finance." *Id.*

Notably, this provision reflects Congress's effort to expand the Secretary's authority. As originally drafted, the Secretary had authority only to establish procedures that would "assure compliance" with other parts of the scheme. Currency and Foreign Transactions Reporting Act, Pub. L. No. 91-508, tit. II, § 205(a), 84 Stat. 1118, 1120 (1970). Later, Congress overhauled the government's ability to investigate and punish money laundering. *See* Annunzio-Wylie Anti-Money Laundering Act, Pub. L. No. 102-550, tit. XV, subtitle B, sec. 1513, § 5318(a)(2), 106 Stat. 4044, 4058 (1992). It provided the Secretary with expanded authority under § 5318(a)(2), including adding the operative language here allowing the Secretary to require reports aimed at "guard[ing] against money laundering." *Id.*; *see also* Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, div. F, tit. LXI, sec. 6102(c), § 5318(a)(2), 134 Stat. 4547, 4553 (2021) (further expanding authority).

The Secretary has delegated his authority under each provision to the Director of FinCEN—a bureau within the Department of the Treasury. *See* Treas. Order 180-01 (July 1, 2014), https://perma.cc/QR2V-3L9T.

**B. Factual Background**

**1.** In 2024, FinCEN promulgated the Final Rule at issue here. Final Rule, 89 Fed. Reg. at 70,258. That Rule addresses "the illicit finance risks posed by criminals," *id.*, including "international drug cartels, human traffickers, [or] corrupt political or business figures," *id.* at 70,259, which "abuse opaque legal entities and trusts to launder ill-gotten gains through transfers of residential real estate," *id.* at 70,258. As FinCEN explained, "[t]his illicit use of the residential real estate market threatens U.S. economic and national security and can disadvantage individuals and small businesses that seek to compete fairly in the U.S. economy." *Id.*

To address these risks, FinCEN required reporting on a particular class of "high-risk" transactions well suited for money laundering. Final Rule, 89 Fed. Reg. at 70,259. Specifically, the Rule covers a set of real-estate transactions defined by three important limitations. *First*, the Rule applies only to "residential real property"—generally meaning property that is intended "for occupancy by one to four families." *Id.* at 70,265. Transactions involving only commercial property or larger residential properties, for example, fall outside the scope of the Final Rule. *Second*, reporting is required only for non-financed transactions, like an all-cash transaction executed without any mortgage loan. *See id.* at 70,266. Most residential real estate transactions

are financed and, thus, would be excluded. *See id.* *Third*, the relevant transaction must convey the property to a covered legal "entity" or a "trust." *See id.* Transfers to individuals are excluded from the reporting requirement, as well as a variety of specified types of entities or trusts that present a low risk for illegal activity. The Rule does not, for example, require the reporting of transactions that follow from the death of the owner (*e.g.*, estate planning), are part of a divorce or bankruptcy, or amount to a transfer from an individual to a trust he created. *Id.* at 70,290 (31 C.F.R. § 1031.320(b)(2)). Similarly, transfers to banks or other financial institutions are excluded from the reporting requirement. *Id.*

Thus, the Final Rule's covered transactions are a set of non-financed residential real-estate deals that present a "high risk for illicit financial activity," Final Rule, 89 Fed. Reg. at 70,258, and "[n]umerous public law enforcement actions illustrate" the attractiveness of these transactions for money laundering purposes, *id.* at 70,259 & n.12. FinCEN identified more than a dozen illustrative cases or investigations that involved money laundering through non-financed residential real estate transactions connected to a range of offenses, including drug trafficking, sanctions evasion, bribery, bank fraud, health care fraud, identity theft, and animal fighting. *See id.* at 70,259 n.12.

The Rule requires a reporting person to file a report with FinCEN for each covered transaction. *See* Final Rule, 89 Fed. Reg. at 70,291-92. That report must include basic information about the parties to the transaction (*e.g.*, beneficial owners of any entity or trust), the property in question, and the amount and method of payment(s) for

the transaction. *See id.* at 70,291-92 (31 C.F.R. § 1031.320(d)-(h)). The report required by the Rule is less detailed than the traditional Suspicious Activity Report (SAR) that FinCEN requires in other contexts, such as by omitting a requirement for a narrative description of the suspicious activity in question. *See id.* at 70,288; FinCEN, U.S. Dep't of the Treasury, *Suspicious Activity Report* (Feb. 2025), https://perma.cc/GWH5-9ER2 (traditional report).

FinCEN relied on both § 5318(g)(1) and § 5318(a)(2) as authorizing the Final Rule. Primarily, FinCEN relied on its authority to require reporting for "any 'suspicious transaction[] relevant to a possible violation of law.'" Final Rule, 89 Fed. Reg. at 70,259 (quoting 31 U.S.C. § 5318(g)(1)); *see also id.* at 70,262. As FinCEN explained, the covered transactions are "high-risk transfers" ripe for abuse. *Id.* at 70,259; *see supra* p. 6-7. As "an additional basis" for the Final Rule, FinCEN relied on "31 U.S.C. [§] 5318(a)(2)," Final Rule, 89 Fed. Reg. at 70,259 n.11, 70,262, explaining that the reporting requirement would "guard against money laundering" and illicit finance, *id.* at 70,259.

**2.** The Final Rule also detailed its prior efforts to police similar transactions. According to FinCEN, these factual findings confirmed the "high-risk" nature of the covered transactions and support "the need for" a "permanent regulatory solution." Final Rule, 89 Fed. Reg. at 70,259-60.

FinCEN previously used another aspect of its authority—Geographic Targeting Orders (GTOs)—to gather information about some covered transactions. Final Rule,

89 Fed. Reg. at 70,258; *see* 31 U.S.C. § 5326(a) (providing authority). Those GTOs proved "effective in identifying the risks" inherent in the covered transactions. Final Rule, 89 Fed. Reg. at 70,260. Law enforcement used FinCEN's GTO information "to generate new investigative leads, identify new and related subjects in ongoing cases, and support prosecution and asset forfeiture efforts." *Id.* Additionally, FinCEN has "cross-reference[d]" its GTO data against other BSA reports. *Id.* Having that GTO information, particularly having it in "the same database as other BSA reports," has allowed authorities to "connect ... activities across" the data. *Id.* Indeed, almost half of the GTO reports (42%) involved individuals who had previously engaged in other suspicious activity. *Id.*

Although the GTOs have been successful, that success was limited. Pursuant to statute, *see* 31 U.S.C. § 5326(a), GTOs have a narrow scope. They apply only for a limited time, in certain regions, and to transactions above a set value. Final Rule, 89 Fed. Reg. at 70,260; *see also id.* at 70,279. Over time, FinCEN expanded its GTOs in response to law enforcement requests—addressing new regions and new transactions. *Id.* at 70,259. But ultimately, it concluded that a nationwide, permanent solution was necessary. A new rule, FinCEN explained, is a "far more efficient and complete mechanism" than a patchwork of GTOs. *Id.* at 70,259 n.13. And that rule will fill a gap that other law enforcement information—which is "often incomplete, unreliable, and diffuse"—cannot. *See id.*

### C. Prior Proceedings

Fidelity sued challenging that Rule under the Administrative Procedure Act (APA). It primarily argued that the Final Rule exceeded FinCEN's statutory authority, while also raising arbitrary-and-capricious, First Amendment, Fourth Amendment, and enumerated-powers challenges. *See* Dkt. 1, at 1-7. In seeking summary judgment, Fidelity abandoned its enumerated-powers challenge. *See* Dkt. 82, at 2 n.1. And on appeal, Fidelity no longer presses its First Amendment claim.

The district court referred this case to a magistrate judge, Dkt. 12, who rejected each of Fidelity's arguments and recommended that summary judgment be granted in the federal government's favor, Dkt. 82.

The magistrate judge first concluded that the Final Rule fell within FinCEN's statutory authority to regulate "any suspicious transaction relevant to a possible violation of law." *See* Dkt. 82, at 3 (quotation marks omitted). Relying on dictionary definitions, it explained the "plain and ordinary meaning of 'suspicious transaction'" encompasses "transactions that 'tend[] to arouse' 'a state of mental uneasiness ... ' or sense of 'something wrong without proof or on slight evidence.'" *Id.* at 17 (first alteration in original). And to be "relevant to a possible violation of law," a transaction need only be "logically connected to the chance that something is or might be illegal." *Id.* at 25 (alteration and quotation marks omitted). In reaching the latter conclusion, the magistrate judge rejected Fidelity's core argument—that § 5318(g)(1) requires "nexus" between "the *particular* transaction" and "illegal activity," *id.* at 18 (emphasis

added) (quoting Dkt. 35, at 14), mandating an "almost invariably ... individualized inquiry," *id.* at 19 (alteration in original) (quoting Dkt. 35, at 17).

Having interpreted the relevant language, the magistrate judge then concluded the Final Rule falls within § 5318(g)(1)'s terms. Dkt. 82, at 26-29. "In short, because non-financed transfers to legal entities and trusts are unlike most residential real-estate transactions, outside the focus of other regulatory safeguards, and transferee-screening, they are, as a category, suspicious and relevant to potential violations of law." *Id.* at 27. This conclusion was a matter of "common sense," the magistrate judge explained, given that the covered transactions are unusual and "can be and have been exploited" for illegal activity. *Id.* at 26-27 (quotation marks omitted). In addition, the magistrate judge noted that "FinCEN [had] relied on more than common sense." *Id.* at 27. It had cited "years of experience" with other reporting requirements, which had proven "effective" but "insufficient." *Id.* at 27-28. FinCEN had also relied on "representative examples of money laundering in transactions that would be subject to the Rule." *Id.* at 29.

Next, the magistrate judge held that the Final Rule came within FinCEN's authority to "require a class of domestic financial institutions ... to maintain appropriate procedures, including the collection and reporting of certain information." *See* Dkt. 82, at 29 (quoting 31 U.S.C. § 5318(a)(2)). At the threshold, the magistrate judge held that FinCEN could rely on § 5318(a)(2) as justifying the Final Rule because that Rule itself "ma[de] clear FinCEN's path[] and intention" to do so. *Id.* at 30-31; *see SEC v. Chenery Corp.*, 318 U.S. 80 (1943) (requiring agency action to be adjudged based on the agency's

contemporaneous reasoning). On the merits, the magistrate judge held that the plain terms of § 5318(a)(2) authorize the Rule, and its interpretation would not create untenable surplusage. Dkt. 82, at 31-33.

Turning to Fidelity's arbitrary-and-capricious arguments, the magistrate judge held the Final Rule was both reasonable and reasonably explained. The magistrate judge observed that Fidelity's arguments that the Final Rule was not properly tailored failed for the same reasons as its arguments that the Rule exceeded FinCEN's statutory authority. Dkt. 82, at 33. The magistrate judge further rejected Fidelity's challenge to FinCEN's cost-benefit analysis, explaining that, under the statutory text, FinCEN need only "consider" the burdens and benefits of its Final Rule and need not conduct any formal cost-benefit analysis. *Id.* at 35-38. Thus, FinCEN was not required to "precisely *quantify* by economic estimate the Rule's benefits." *Id.* at 37. And the magistrate judge rejected Fidelity's arguments that FinCEN had failed to properly respond to significant comments, noting the agency's response on the specific issues identified in the preamble to the Final Rule. *Id.* at 39-43.

Finally, the magistrate judge rejected Fidelity's Fourth Amendment challenge. The Final Rule is "properly tailored to suspicious transactions relevant to possible violations of law and to guard against money laundering," and that is all the Fourth Amendment requires. Dkt. 82, at 43 (citing *Shultz*, 416 U.S. at 21, 59-60, 65-67).

The district court adopted the recommendation in full. Dkt. 91. It noted that "Plaintiffs' objections largely reiterate arguments presented in their summary judgment

briefs." *Id.* at 3. But it went on to conduct a "thorough[] review[]" of the "record and Plaintiffs' arguments," rejecting those arguments on the merits. *Id.*

On the statutory-authority issue, the district court recounted Fidelity's core § 5318(g)(1) argument as focusing on the need for regulation "only at the individual transaction level" and "not as to a category of suspicious transactions." Dkt. 91, at 4. The court rejected that argument based on the statutory text. *Id.* The court next concluded that § 5318(a)(2) "independently authorizes the Rule," rejecting Fidelity's attempt to narrow that provision to authorize only procedural rules. *Id.* at 5-6. The court also held that, even if § 5318(a)(2) led to surplusage, it could not ignore the meaning of that provision's plain text. *Id.* at 6. Finally, the court held that neither restrictions on GTOs in § 5326 nor the major-questions doctrine serve to limit the scope of § 5318(a)(2). *Id.* at 6-8. As to the latter point, the court reasoned, the Final Rule "pales in comparison" to actions for which the major-question doctrine has been invoked, and even if that doctrine applied, Congress provided clear statement that overcomes it. *Id.* at 7-8.

On the arbitrary-and-capricious issue, the district court likewise adopted the magistrate judge's reasoning. Recognizing that Fidelity's arguments were largely "recycled" versions of the assertions it made to the magistrate judge, and having conducted "an independent de novo review of the record," the court found no basis for overturning the magistrate judge's well-reasoned opinion. Dkt. 91, at 10.

Finally, the district court adopted the magistrate judge's Fourth Amendment analysis, concluding that *Shultz* controlled. Dkt. 91, at 10-12.

### D. Standard of Review

This Court reviews de novo a grant of summary judgment, applying the same standard as the district court. *High Point, LLLP v. NPS*, 850 F.3d 1185, 1193 (11th Cir. 2017). Under the APA, final agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it is "in excess of statutory ... authority." 5 U.S.C. § 706(2)(A), (C).

## SUMMARY OF ARGUMENT

**I.** FinCEN acted well within its authority under § 5318(g)(1) and § 5318(a)(2) when it promulgated the Final Rule.

**A.** The Final Rule falls within FinCEN's authority to require reporting for "any suspicious transaction." 31 U.S.C. § 5318(g)(1). As the district court held, a transaction is suspicious if it "tend[s] to arouse" a "sense" that "something" is "wrong," even if that transaction is ultimately lawful. *See* Dkt. 82, at 17 (quotation marks omitted). And a "suspicion" can be based on slight evidence—proof is not required. *See id.* As FinCEN explained, the Final Rule targets a narrow class of transactions that are inherently suspicious. By their nature, those transactions are atypical and ripe for abuse by criminals. And those transactions have, in fact, been used routinely by criminals seeking to launder funds. Moreover, FinCEN explained that in its experience with reporting requirements for similar transactions that covered specific geographic areas

at certain price thresholds, 42% of reported transactions were linked to other suspicious activity.

Fidelity offers no persuasive argument to the contrary. As Fidelity admits, a transaction can be suspicious—raising the specter of wrongdoing—even if one can hypothesize legitimate reasons for that transaction. And Fidelity recognizes that FinCEN may require the reporting of transactions on a categorical basis. Fidelity's arguments that the Final Rule departs from a prior settled definition of "suspicious" that the agency adopted are belied by the very regulations it cites, and its other contentions fail to grapple with the explanation FinCEN put forward for the Rule.

**B.** Separately, the Final Rule falls within FinCEN's authority to impose "appropriate procedures, including the collection and reporting of certain information" that "guard against money laundering, the financing of terrorism, or other forms of illicit finance." 31 U.S.C. § 5318(a)(2). The Final Rule requires the "reporting of certain information" for covered transactions, *see id.*, and in doing so, will allow FinCEN and its law enforcement partners to prevent illicit finance.

Fidelity must rewrite the statutory text to argue otherwise. It starts with a dictionary definition for "procedure," distinguishing procedures from a "substantive" obligation to report information. Br. 26. But that focus on specific terms in isolation ignores that Congress expressly provided the "reporting of certain information" as an example of "appropriate procedures" under the statute. 31 U.S.C. § 5318(a)(2). It also ignores the statutory history—which reflects expanding FinCEN's authority to allow

for substantive reporting, including specifically reporting to "guard against money laundering, the financing of terrorism, or other forms of illicit finance"—language Fidelity's reading renders meaningless.

**C.** Finally, nothing about this case implicates the major-questions doctrine. The interpretive questions here do not raise questions of "vast economic and political significance." *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) (quotation marks omitted). And even if they did, the statutory language here provides a clear statement that overcomes any major-questions concern.

**II.** Next, Fidelity argues the Final Rule is arbitrary and capricious. But as the district court concluded, that Rule is "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The fact findings that undergird the Rule—*i.e.*, that the covered transaction are suspicious—are thoroughly explained and supported by FinCEN's regulatory experience and law enforcement efforts to combat money laundering and terrorism. Moreover, FinCEN explained how the Final Rule will lead to substantial, though not quantifiable, benefits for law enforcement and society. Against this backdrop, FinCEN explained, the burdens of the Final Rule are justified.

**III.** Fidelity's Fourth Amendment arguments are foreclosed by precedent. Even assuming that reporting requirements are searches and that Fidelity has Fourth Amendment rights, the requirements are consistent with the Fourth Amendment. *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 30 (1974). Financial institutions have no

unqualified right to conduct their affairs in secret and, thus, can be subjected to reasonable reporting requirements such as those at issue here.

## ARGUMENT

### I. FinCEN Had Statutory Authority to Promulgate the Final Rule

FinCEN promulgated a Final Rule that will combat financial crime. *See* Final Rule, 89 Fed. Reg. 70,258. Criminals who have ill-gotten gains, like drug dealers and terrorists, often hide those funds in residential real estate. In doing so, criminals can structure their transactions to avoid discovery. By foregoing financing (*e.g.*, a mortgage loan) and purchasing a property with cash, criminals skirt ordinary reporting channels. And when a criminal hides behind a legal entity or trust, using that entity to acquire property, it can be difficult to uncover his identity. Indeed, FinCEN has "long recognized the illicit finance risks posed by criminals and corrupt officials who abuse opaque legal entities and trusts to launder ill-gotten gains through transfers of residential real estate." *Id.* at 70,258. Thus, in the Final Rule, FinCEN imposed reporting requirements on a narrowly drawn class of high-risk transactions: certain non-financed residential real estate transfers to legal entities and trusts.

This is precisely the sort of reporting requirement Congress envisioned in the BSA. In that statute, and through subsequent amendments, Congress has conferred a significant "sweep of ... authority" on FinCEN. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 30 (1974). Two aspects of that authority are relevant here, and as the district court correctly held, both support the Final Rule.

### A. The Final Rule Requires Reporting for "Suspicious Transactions," as Authorized in § 5318(g)(1)

FinCEN "may require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). That power readily covers a requirement to report the defined class of transactions addressed by the Final Rule, which have multiple characteristics that make them attractive to money laundering efforts by drug cartels, human traffickers, and other illicit actors.

**1.** Start with the central statutory term "suspicious." Congress did not define that term, so the Court looks to the "ordinary meaning" of the statutory text. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). Something is "suspicious" if it "arous[es] or tend[s] to arouse suspicion." *Suspicious*, Webster's New International Dictionary 2304 (3d ed. 1976); *see Suspicious*, Oxford English Dictionary 324 (2d ed. 1989) ("exciting suspicion"). And "suspicion," in turn, reflects an "imagination or apprehension of something wrong or hurtful without proof or on slight evidence." *Suspicion*, Webster's New International Dictionary 2304 (3d ed. 1976); *see Suspicion*, Oxford English Dictionary 323 (2d ed. 1989) ("apprehension of guilt or fault on slight grounds or without clear evidence"); *Suspicion*, Black's Law Dictionary 1447 (6th ed. 1990) ("Suspicion implies a belief or opinion based upon facts or circumstances that do not amount to proof.").

As these formulations imply, something is suspicious if it simply gives rise to a concern that some unlawful conduct may be afoot, such that further examination may be warranted. Of course, suspicions may prove to be unfounded; a transaction that arouses suspicion of "something wrong" in the absence of any "proof" or the presence of only "slight evidence" may in fact be entirely lawful. *Suspicion*, Webster's New International Dictionary 2304 (3d ed. 1976). But that does not alter the fundamental character of the transaction as "suspicious" in the first instance. Congress confirmed as much when it referenced "suspicious transaction[s]" that are relevant to "*possible* violation[s] of law or regulation." 31 U.S.C. § 5318(g)(1) (emphasis added); *see id.* § 5318(g)(5)(D)(ii)(I) (referencing "potential violations of law"). An actual violation of law is not required.

Indeed, both courts that have examined the statutory text have reached the same conclusion—even the district court decision Fidelity invokes. The district court here considered similar dictionary definitions and construed the phrase "suspicious transaction" to reach any transaction that "tend[s] to arouse" a "state of mental uneasiness" or a "sense" that "something" is "wrong without proof or on slight evidence." *See* Dkt. 82, at 16-17 (quotation marks omitted). The court decision on which Fidelity relies likewise held that "to be suspicious, a transaction must tend to arouse the belief that something is wrong based on facts or circumstances that do not amount to proof but may be based on slight evidence" and that "suspicious does not mean unlawful" and that § 5318(g)(1) authorizes rules that "sweep in legitimate

transactions." *Flowers Title Cos. v. Bessent*, 826 F. Supp. 3d 813, 820-21 (E.D. Tex. 2026) (alterations and quotation marks omitted).

**2.** The Final Rule here is a straightforward exercise of that authority, as the district court concluded. *See* Dkt. 82, at 26-29. The Rule defines a category of transactions that have a combination of features which make them especially attractive to drug cartels, human traffickers, and other illicit actors seeking to launder funds through the real estate market. Those features also distinguish those transactions from run-of-the-mill residential real estate transactions, as well as other non-financed transactions to trusts and legal entities. And the Rule explains in detail why those features raise the specter of unlawful activity, such that further examination is warranted even if the transaction is ultimately lawful.

Specifically, the Rule requires reporting of transactions involving residential real estate for which there is no financing and the entity acquiring the property is a particular type of legal entity or trust. Those types of transfers are unusual—and attractive to illicit actors—for multiple reasons. First, in the residential real estate market for properties designed "for occupancy by one to four families"—in other words, single-family homes or small multi-family buildings—financing is the norm. Final Rule, 89 Fed. Reg. at 70,265. As the district court recognized, "[m]ost transfers" involve some financing arrangement, like a "mortgage loan" from a "financial institution[]" covered by the BSA. Dkt. 82, at 26-27 (first alteration in original) (quoting Final Rule, 89 Fed. Reg. at 70,259). And that arrangement mitigates the risk of money laundering. A bank

or other financing entity is required by statute to establish its own "policies, procedures, and controls" to thwart money laundering and the financing of terrorism. Final Rule, 89 Fed. Reg. at 70,258 (quoting 31 U.S.C. § 5318(h)(1)(A)). By foregoing any financing arrangement, such as through an all-cash purchase, the covered transactions skirt these regulatory protections.

Concerns about potential money laundering are only "heighten[ed]" when real estate is transferred to a legal entity or trust. *See* Final Rule, 89 Fed. Reg. at 70,259. These legal arrangements can "obfuscat[e]" the "true ownership" of the acquired property. *Id.* at 70,259 n.12 (quotation marks omitted). This is especially true when criminals make use of so-called "secrecy jurisdictions." *Id.* (quotation marks omitted). Those jurisdictions have "strict laws of secrecy as to bank activity," *Shultz*, 416 U.S. at 27, allowing criminals to set up "shell companies or trusts" while avoiding detection. Final Rule, 89 Fed. Reg. at 70,259 n.12 (quotation marks omitted). Then, those criminals may use a shell company to purchase residential real estate without financing—attempting to launder illicit proceeds.

FinCEN also further tailored the scope of the Rule by excluding numerous transfers involving a legal entity or trust that it nevertheless found to be "a lower risk for money laundering," like transfers as part of estate planning, tax deferral, or the dissolution of a marriage, or transactions that are supervised by a court. *See* Final Rule, 89 Fed. Reg. at 70,267-68. These transactions are "governed by preexisting legal documents" or "generally involve the court system," reducing the risk of any illicit

activity. *See* Anti-Money Laundering Regulations for Residential Real Estate Transfers, 89 Fed. Reg. 12,424, 12,436 (Feb. 16, 2024) (Proposed Rule). When a court supervises a transaction, for example, that transaction is "publicly documented and subject to oversight and therefore [is] subject to a lower risk for money laundering." Final Rule, 89 Fed. Reg. at 70,268.

FinCEN also excluded several "highly regulated" entities from its new reporting requirement. Final Rule, 89 Fed. Reg. at 70,269, 70,282. This includes specified "securities reporting issuer[s]," "governmental authorit[ies]," "bank[s]," "credit union[s]," "public utilit[ies]," and many other transferees. *Id.* at 70,293-94. Those entities, in general, are already subject to reporting requirements that mitigate the risk of money laundering. *See id.* at 70,282. This includes anti-money laundering programs established by FinCEN, as well as other regulatory programs like current and periodic reporting requirements under the Securities Exchange Act. *Id.* Those separate programs would serve to ferret out any illicit activity, rendering additional reporting unnecessary. By narrowing its Final Rule in this way, FinCEN focused its regulatory efforts on the transactions with the highest risk of undetected abuse.

Indeed, because of FinCEN's definitional tailoring, the Rule is likely to require the reporting of a relatively small fraction of all residential real estate transactions in any given year. Although precise estimates are difficult to compile because of the diffuse nature of real estate transaction records, FinCEN observed that in one dataset covering over 39 million non-financed real estate transactions from 2015-2019, "approximately

11 percent" involved "purchases by legal entities," not all of which would be required to be reported under the Rule. Final Rule, 89 Fed. Reg. at 70,281. Similarly, FinCEN estimated that at most five percent of all residential real estate transactions might involve trusts, observing that there was limited empirical data but that one study had suggested that trusts were the buyer "in 3.3 percent" of residential real estate transactions between 2015 and 2019—though here too not all such transactions would be reported under the Rule. *Id.*

In sum, the Final Rule targets transactions that, by their very nature, are unusual and popular with criminals. By using a front company to purchase a home with ill-gotten cash, for example, a criminal can funnel illicit funds into real estate while skirting the money-laundering protections imposed on financial institutions and obscuring his identity. And "[n]umerous public law enforcement actions illustrate" the risks inherent in the covered transactions. Final Rule, 89 Fed. Reg. at 70,259 & n.12. FinCEN identified more than a dozen cases or investigations that involved money laundering through non-financed residential real estate transactions. *See id.* at 70,259 n.12 (collecting cases). Those transactions also generally involved a legal entity or trust. *Id.* As these examples show, "international drug cartels, human traffickers, [or] corrupt political or business figures" may use covered transactions to hide their illicit proceeds. *Id.* at 70,259.

FinCEN's prior regulatory efforts related to these transactions underscore the point. Beginning in 2016, FinCEN used GTOs to require reporting for certain non-

financed transfers of residential real estate. *See* 31 U.S.C. § 5326(a). Those orders were limited in time, restricted to certain areas, and applied only to transactions above a specified value. Final Rule, 89 Fed. Reg. at 70,259-60. But the results of those reports were remarkable: "from 2017 to early 2024, approximately *42 percent* of non-financed real estate transfers captured by the Residential Real Estate GTOs were conducted by individuals or legal entities on which a SAR has been filed" in another context—in other words, by individuals or entities "also engaging in other identified forms of suspicious activities." *Id.* at 70,260 (emphasis added). And law enforcement used FinCEN's GTO information "to generate new investigative leads, identify new and related subjects in ongoing cases, and support prosecution and asset forfeiture efforts." *Id.*

Indeed, the GTOs proved so effective that law enforcement repeatedly asked FinCEN to expand their scope to cover new areas and additional transactions. Final Rule, 89 Fed. Reg. at 70,259. And that experience informed FinCEN's decision to create a unified nationwide framework for reporting the transactions most ripe for abuse. *See id.* at 70,259 n.13. As FinCEN explained, the covered transactions are attractive to criminals irrespective of the value of the real estate involved, as "[l]ow value non-financed transfers to legal entities and trusts, including gratuitous ones for no consideration, can present illicit finance risks and are therefore of interest to law enforcement." *Id.* at 70,269 (referencing "FinCEN's experience" that the "threshold of $300,000" for GTOs would exclude money-laundering transactions); *see also, e.g.*, *United States v. Fernandez*, 559 F.3d 303, 314 (5th Cir. 2009) (affirming money-laundering

conviction for member of drug-trafficking organization based on residential real estate transactions worth much less than $300,000). Rather than excluding low-value transactions entirely, FinCEN provided exceptions to its Final Rule—excluding transfers incident to common matters like estate planning or divorce settlements, or transfers to regulated entities like banks—to "focus the reporting requirement on higher-risk low-value transfers." Final Rule, 89 Fed. Reg. at 70,269.

In the end, the Final Rule here is no different from Fidelity's list of "conceivable categories of transactions that could sensibly be deemed suspicious and relevant to a possible violation of law." Br. 26. If § 5318(g)(1) is broad enough to authorize reporting for any transaction by "individuals previously suspected of involvement in money laundering," as Fidelity admits (*id.*), it is also broad enough to reach a class of transactions (*i.e.*, the covered transactions) that have previously been suspected of involvement in money laundering. There is no meaningful difference between these examples under the statutory text. In either case, one has reason to suspect wrongdoing—even if the relevant transaction proves to be entirely lawful, as some transactions by individuals "suspected of involvement in money laundering" would no doubt be. *See id.*

**3.** Fidelity's contrary arguments are difficult to parse. Fidelity does not appear to dispute that the transactions covered by the Final Rule have multiple aspects that make them particularly attractive to drug cartels, corrupt foreign officials, and other criminals looking to engage in money laundering. And Fidelity's own interpretation of

the statutory text does not appear to deviate substantially from the interpretation outlined above (and adopted by the district court). Fidelity apparently agrees that FinCEN may require the reporting of transactions if there is a "reason to suspect" (Br. 20) that those transactions relate to conduct that "might plausibly" (Br. 24) be unlawful. And Fidelity expressly acknowledges that FinCEN may create reporting requirements that operate on a category of transactions, without individualized determinations as to each specific transaction. Br. 25.

Rather than engage with the plain meaning of the term "suspicious," Fidelity leads by contending that the Final Rule departs from a prior "definition" of the statutory term the agency supposedly adopted. Br. 18-19. But not one of the half-dozen regulations Fidelity cites (Br. 18 n.5) defines the phrase "suspicious transaction." *See, e.g.*, 31 C.F.R. § 1020.320. Instead, in each regulation, FinCEN identified a subset of "suspicious transaction[s]" for which reporting is required. *Id.* § 1020.320(a)(1). For example, "[e]very bank shall" report "in the manner required by [§ 1020.320]" certain "suspicious transaction[s]." *Id.* That reporting is required when various conditions are satisfied, including that the "bank knows, suspects, or has reason to suspect" specified unlawful activity. *Id.* § 1020.320(a)(2). At the same time, FinCEN authorized reporting for "any suspicious transaction" even when "reporting is not required by [§ 1020.320(a)(2)]." *Id.* § 1020.320(a)(1). It is thus clear on its face that § 1020.320(a)(2) does not represent an all-inclusive definition for "suspicious transaction," and nothing

about those other regulations indicates or implies a departure from the plain meaning of the term "suspicious."

Fidelity's other arguments (Br. 19-23) mostly attempt to suggest that the transactions at issue here are not sufficiently suspicious. Fidelity repeatedly urges, for example, that "[e]ntities and trusts acquire residential property for countless legitimate reasons all the time," Br. 20; *see also* Br. 21 (characterizing transactions as "in principle entirely lawful"), and that there is no evidence that "most" transactions covered by the Final Rule are unlawful, Br. 21. These arguments largely overlap with Fidelity's arbitrary-and-capricious arguments, addressed more fully below. *See infra* pp. 38-49. To the extent they are relevant to interpreting the statutory text, they only underscore the untenable nature of Fidelity's position. Fidelity does not (and cannot) argue that a transaction is suspicious only if there are no legitimate reasons for engaging in that transaction. And as noted, Fidelity expressly concedes (Br. 25) that the statute authorizes reporting requirements for transactions on a categorical basis. Nor does Fidelity identify any basis in the ordinary meaning of the term "suspicious" or any other aspect of the statutory text for some hard numerical threshold at which a class of transactions may be deemed "suspicious." *See* Br. 21 (criticizing absence of evidence "that every transaction or even most" are unlawful).

Moreover, Fidelity does not dispute that the covered transactions are uniquely susceptible to abuse given their unique combination of characteristics. Fidelity's dismissal of the Final Rule as premised on the view "that these are a set of transactions

that simply are not covered by any other bank reporting requirements," Br. 20-21, fails entirely to engage with the multiple features of the specific transactions here that FinCEN explained make them particularly susceptible to abuse—unlike the multiple types of non-financed transactions with legal entities and trusts that the Final Rule exempts.

Fidelity underscores its error by refusing to treat all of those factors together. Fidelity instead asserts that "[e]ntities and trusts acquire residential property for countless legitimate reasons." Br. 20. That is true, but largely irrelevant: many transactions by entities and trusts are not covered by the Final Rule, either because they are financed or because they are excluded under one of the Rule's exceptions, such as transactions related to "estate planning," *id.*; *see* Final Rule, 89 Fed. Reg. at 70,267-68. Similarly, Fidelity observes that purchasers may avoid financing to save on "lending costs" or because they do not need it, Br. 20, but again, many such transactions are not covered by the Final Rule, either because they involve purchases by individuals or because they fall within one of the exceptions. Only transactions that meet *all* of the relevant criteria, and do not fall within *any* of the Rule's exceptions, are covered by the reporting requirement, and Fidelity nowhere grapples with this fact.

Against this backdrop, Fidelity's reliance on *Lopez v. First Union National Bank of Florida*, 129 F.3d 1186 (11th Cir. 1997), is difficult to fathom. In that case, this Court interpreted § 5318(g)(3), under which financial institutions "shall not be liable" for any "voluntary disclosure of any possible violation of law" or for any "disclosure pursuant

to [§ 5318(g)] or any other authority." *See* 31 U.S.C. § 5318(g)(3)(A). Section 5318(g)(3) thus makes clear that financial institutions cannot be held liable for reporting required by regulations issued under § 5318(a)—including the Final Rule here. In dicta Fidelity cites, *Lopez* stated that a voluntary "'disclosure of any possible violation of law'" indicates that safe harbor is available "even if it ultimately turns out there was no violation of law" and that an institution must only "have a good faith suspicion that a law or regulation may have been violated." 129 F.3d at 1192-93.

The relevance of that language to the Final Rule is unclear. The district court's own commentary on *Lopez* was directed to addressing the argument—which Fidelity has expressly abandoned—that § 5318(g)(1) does not permit categorical reporting requirements but instead allows for reporting only "on transactions that support a reasonable basis for believing that the *particular* transaction has a nexus with legal activity." Dkt. 82, at 18 (emphasis added) (quotation marks omitted) (quoting Dkt. 35, at 14). As noted, Fidelity now apparently agrees that FinCEN may regulate transactions on a categorical basis. The question here is thus whether FinCEN reasonably determined that the class of transactions at issue here are suspicious. *Lopez*'s passing comment about a bank's safe harbor for entirely voluntary disclosures—which necessarily are evaluated on an individualized basis—says nothing about that question. *See id.* at 20 n.13. To the extent *Lopez* is relevant, it only confirms that a transaction may be "suspicious" even if lawful—another proposition Fidelity does not apparently dispute.

Fidelity's remaining arguments are even further afield. Fidelity suggests that the district court "embrac[ed]" a "'without proof' standard." Br. 18. As explained, dictionary definitions regularly contrast the word "suspicion" with the concept of proof, *see supra* pp. 18-20, and Fidelity's own interpretation does not require *proof* of wrongdoing—just a "reason" (Br. 20) to think the transaction "might plausibly" be unlawful (Br. 23-24). And Fidelity's passing assertion that the Final Rule improperly implements a "subjective" standard (Br. 19) is wrong. The Final Rule identifies a class of transactions that have multiple objective characteristics that make them particularly ripe for abuse, have repeatedly appeared in law enforcement actions, and have been connected to other suspicious activity. FinCEN thus properly determined that those transactions were "suspicious transactions" for which reporting was warranted.

### B. The Final Rule Requires Reporting that Guards Against Illicit Financing, as Authorized in § 5318(a)(2)

As the district court held, the Final Rule is alternatively authorized by 31 U.S.C. § 5318(a)(2), which allows FinCEN to impose reporting requirements that "guard against money laundering" and other forms of "illicit finance." Fidelity argues otherwise, but it offers no basis for overturning the court's well-reasoned conclusion.

**1.** Congress, through the Secretary, delegated FinCEN authority to "require a class of domestic financial institutions" to "maintain appropriate procedures." 31 U.S.C. § 5318(a)(2). Those procedures may "includ[e] the collection and reporting of certain information as [FinCEN] may prescribe by regulation," and any new reporting

requirement must serve at least one of two goals. *See id.* It must either "ensure compliance" with aspects of the BSA or "guard against money laundering, the financing of terrorism, or other forms of illicit finance." *Id.* In short, Congress delegated FinCEN authority to require "the collection and reporting of certain information" to "guard against money laundering." *Id.*

The Final Rule falls within the plain text of § 5318(a)(2). The Rule applies to a narrow class of domestic financial institutions, *i.e.*, certain persons involved in real estate transfers in the United States. 31 U.S.C. § 5312(a)(2)(U) (defining "financial institution" to include "persons involved in real estate closings and settlements"). And it requires those institutions to "report[]" on covered transactions. *See id.* § 5318(a)(2). Those reports will, in turn, "guard against money laundering" and other forms of "illicit finance." *Id.* Monitoring the covered transactions will allow FinCEN and its law enforcement partners to ferret out unlawful activity among a class of transactions ripe for abuse.

**2.** Fidelity argues that FinCEN did not properly invoke § 5318(a)(2) or, in the alternative, that that provision does not authorize the Final Rule. Both arguments fail.

**a.** The Final Rule explains that Congress "amended 31 U.S.C. [§] 5318(a)(2) to give the Secretary the authority to 'require a class of domestic financial institutions or nonfinancial trades or businesses to maintain appropriate procedures, including the collection and reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ... guard against money laundering, the financing of

terrorism, or other forms of illicit finance,'" and states that "FinCEN believes this authority also provides an additional basis for the reporting requirement adopted in this final rule." Final Rule, 89 Fed. Reg. at 70,259 n.11 (second alteration in original). That statement mirrored the notice of proposed rulemaking, which likewise identified § 5318(a)(2) as an additional source of authority. Proposed Rule, 89 Fed. Reg. at 12,429 n.47. And as the district court observed, the Final Rule explains in great detail how the reporting requirement would "guard against" money laundering and illicit finance. *See supra* pp. 20-25; Dkt. 82, at 13.

Fidelity cites (Br. 30) no case holding that an agency's express invocation of a particular statutory provision as a source of authority for a rule is insufficient to "disclose[] that" the agency's "action was based" on that provision. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Nor could it: an agency need not "follow a particular formula or incant 'magic words'" to explain its decision, and that sort of express invocation allows "'the agency's path'" to "'reasonably be discerned.'" *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)) (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 431-32 (1999)). Nor does Fidelity grapple with the agency's extended explanation of how the Final Rule will combat money laundering and illicit finance.

**b.** On the merits, Fidelity offers an interpretation of § 5318(a)(2) that cannot be squared with the statutory text or history. Focusing on the term "procedures," Fidelity

contends that § 5318(a)(2) "authoriz[es] FinCEN to require financial institutions to maintain procedures for complying with collection and reporting requirements" imposed by other provisions of law, "not to impose a requirement that they actually collect and report" any information in the first instance. Br. 27.

Fidelity's argument begins from mistaken premises, focusing on the "dictionary definition" for an "isolated word[]" without "account[ing] for the governing statutory context." *Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010). Congress already explained what it meant by "procedures" in the statutory text—at least as relevant here. *See* 31 U.S.C. § 5318(a)(2). FinCEN is authorized to impose "appropriate procedures, *including the collection and reporting of certain information*." *Id.* (emphasis added). Whatever the word "procedures" might mean in the abstract, in this context, it must at least include reporting requirements.

Even if that were not so, however, Fidelity's unduly narrow understanding of the word "procedures" is mistaken. A "procedure" also describes any "course of action," not just the way of doing something. *See Procedure*, Oxford English Dictionary 543 (2d ed. 1989); *Procedure*, Black's Law Dictionary (12th ed. 2024), Westlaw ("A specific method or course of action."). In fact, that is the ordinary use for the plural "procedures." *See Procedure*, Oxford English Dictionary 543 (2d ed. 1989). When FinCEN imposes a reporting requirement like the one here, it directs financial institutions to follow a specified "course of action," *id.*, with respect to "the collection

and reporting of certain information" to "guard against money laundering," 31 U.S.C. § 5318(a)(2).

Moreover, that is the only reading that makes of the entire statutory text and Congress's repeated amendments of the statute. Limiting § 5318(a)(2) to "procedural" requirements—*i.e.*, those to enforce an already-existing reporting obligation—would render much of the statutory language meaningless. Section 5318(a)(2) already expressly allows the imposition of rules that "ensure compliance with" other provisions of the BSA, and Fidelity has no account for what additional meaning the language providing authority "to guard against money laundering, the financing of terrorism, or other forms of illicit finance" would carry. That failure is all the more glaring given the statutory history. *United States v. Hansen*, 599 U.S. 762, 775 (2023) ("Statutory history is an important part of [the] context" for interpreting text.). Congress originally delegated the Secretary "the responsibility to assure compliance" with various reporting requirements. *See* Pub. L. No. 91-508, § 205(a), 84 Stat. at 1120. To do so, the Secretary was authorized to impose new "procedures" but only to the extent those procedures would "assure compliance" with the relevant statutes. *Id.* § 205(b), 84 Stat. at 1120.

Over time, Congress expanded this authority—adding authority to "guard against money laundering," *see* Pub. L. No. 102-550, sec. 1513, § 5318(a)(2), 106 Stat. at 4058, and to combat the "financing of terrorism" and other forms of "illicit finance," Pub. L. No. 116-283, sec. 6102(c)(2), § 5318(a)(2), 134 Stat. at 4553. Congress also clarified that "procedures" should be read to "includ[e] the collection and reporting of

certain information." *Id.* sec. 6102(c)(1), § 5318(a)(2), 134 Stat. at 4553. These amendments must be presumed to have "real and substantial effect," expanding the authority provided under § 5318(a)(2). *Stone v. INS*, 514 U.S. 386, 397 (1995). Fidelity's reading fails that basic requirement.

Fidelity attempts to avoid this straightforward reading of the statutory text by arguing that "the more general term" (*i.e.*, "procedures") operates to narrow the meaning of "the subsequently listed examples" (*i.e.*, the "reporting of certain information"). Br. 29 (quoting *Sweet Additions Ingredient Processors, LLC v. Meelunie Am., Inc.*, 139 F.4th 1217, 1231 (11th Cir. 2025) (per curiam)). That argument cannot give meaning to the congressional amendments Fidelity ignores, and of course, the express text makes clear that "the collection and reporting of certain information" is among the "procedures" authorized. *See Sweet Additions*, 139 F.3d at 1231 (explaining that the "word 'including'" means "to place, list, or rate as a part or component of a whole or ... a larger group, class, or aggregate," and thus that "any ... term in [such a] list" ought to be treated "as an example" of the broader category (quotation marks omitted)). The salient point is that the relevant procedures not only may include "the collection and reporting of certain information," but that those procedures may be imposed *either* to carry out the other provisions of the BSA "*or* to guard against money laundering, the financing of terrorism, or other forms of illicit finance." 31 U.S.C. § 5318(a)(2) (emphasis added). The substantive purpose of the requirements flows from this latter provision, for which Fidelity has no explanation.

Fidelity likewise errs in relying on *United States v. Bittner*, 19 F.4th 734, 745 (5th Cir. 2021). Br. 27. The court in *Bittner* distinguished between a "substantive" requirement to file certain reports and the "procedural" requirement to file reports in a specified manner, 19 F.4th at 745-46, but in a context that bears no resemblance to this one. In *Bittner*, the Fifth Circuit interpreted 31 U.S.C. § 5314(a)—a statute that does not use the words "procedure" or "procedures." And its substantive-procedural distinction operated only as a gloss on § 5314(a)'s separate requirements "to ... file reports" and that those reports "contain [specified] information." 31 U.S.C. § 5314(a). In light of these statutory differences, the Fifth Circuit's decision in *Bittner* is of no import here: that decision does not inform what Congress meant by "maintain appropriate procedures" in § 5318(a)(2), particularly given Congress's express statement that such procedures "includ[e] the collection and reporting of certain information" to combat money laundering and other illicit finance. *Id.* § 5318(a)(2). Indeed, Fidelity falls into the very trap *Bittner* warned against—being "mesmerized by judicial language taken out of context and hardened into formula." *Bittner*, 19 F.4th at 744 (quotation marks omitted).

Finally, Fidelity is mistaken to suggest the government's interpretation would lead to impermissible surplusage. Br. 28-29, 31-32. As discussed, Fidelity's reading itself produces surplusage and renders Congress's amendments meaningless, and so the canon against surplusage could not aid Fidelity here. *Fischer v. United States*, 603 U.S. 480, 496 (2024) (the surplusage canon only favors a reading that produces substantially

less surplusage). But Fidelity is mistaken in any event, as §§ 5318(g)(1), 5318(n), or 5326 are not rendered meaningless. To see why, consider two limitations in § 5318(a)(2): rules under that provision must apply to "a class" of institutions and, as relevant here, must "guard against money laundering, the financing of terrorism, or other forms of illicit finance." 31 U.S.C. § 5318(a)(2). The first limitation does not appear in §§ 5318(g), 5318(n), or 5326. Under each of those provisions, FinCEN can regulate any financial institution individually—not just a "class" of institutions. *See id.* Thus, in that respect, §§ 5318(g), 5318(n), and 5326 are *broader* than the authority in § 5318(a)(2). Similarly, for the suspicious-transaction authority under § 5318(g)(1), FinCEN can address transactions relevant to any "possible violation of law or regulation"—not just those directed at money laundering, financing terrorism, or other forms of illicit finance. *Id.* § 5318(g)(1). Again, this makes § 5318(g)(1) meaningfully broader than § 5318(a)(2) in this respect.

**C. The Major-Questions Doctrine is Irrelevant Here**

Finally, as to both provisions, Fidelity invokes the major-questions doctrine and other clear-statement rules for statutory interpretation. Br. 33-35; *see Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam). Under these doctrines, there is a presumption that Congress will "speak clearly" when addressing an issue "of vast economic and political significance" or when altering the balance of federal power. *See Alabama*, 594 U.S. at 764 (quotation marks omitted). As the district court concluded, this rule does nothing of the sort. Dkt. 91, at 6-9. It requires minimal reporting for a

tailored class of residential real-estate transactions, and it "pales in comparison" to situations in which courts have required a clear congressional statement. Dkt. 91, at 6-9; *see Alabama*, 594 U.S. at 764 (eviction moratorium costing approximately $50 billion per year); *Biden v. Nebraska*, 600 U.S. 477, 496 (2023) (student-loan forgiveness program "affecting 43 million Americans and $430 billion in federal debt"); *West Virginia v. EPA*, 597 U.S. 697, 715, 724 (2022) (plan "to substantially restructure the American energy market" that was estimated to "reduce GDP by at least a trillion 2009 dollars by 2040"). Nevertheless, if clear statement were required, both provisions would satisfy that bar. Section 5318(g)(1) provides express authority to regulate suspicious transactions. Section 5318(a)(2) similarly provides a clear statement of authority to require the reporting of information to combat money laundering and illicit finance. And both appear in a statute designed to confer authority on the Secretary and to combat exactly the sort of illicit activities that motivated the Final Rule here—"exactly the sort of place we would expect to find" that authority. *Atlantic Richfield Co. v. Christian*, 590 U.S. 1, 22 (2020).

## II. The Final Rule Is Not Arbitrary and Capricious

Fidelity separately asserts that the Final Rule is arbitrary and capricious, but it offers no basis for reversal. Under that standard, FinCEN's actions must be "reasonable and reasonably explained," and "a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). So long as FinCEN has "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action including a rational connection between the facts found and the choice made," this Court cannot second-guess the agency's judgment. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). That standard is easily satisfied here.

**1.** In the main, Fidelity asserts (Br. 21-22, 43-48) that FinCEN has failed to articulate why the transactions covered by the Final Rule are "suspicious," casting FinCEN's reasoning as based on unsupported "common sense" or "vague invocations of FinCEN's 'experience,'" *see* Fidelity Br. 44, and suggesting that the Final Rule addresses the covered transactions merely because "they were not subject to any existing regulation or other method of screening," *e.g.*, Fidelity Br. 18.

That is mistaken in every respect. As noted, Fidelity does not meaningfully dispute that the covered transactions are attractive to criminals—the core finding on which the Rule was based. *See supra* pp. 20-25. As FinCEN explained, by forgoing any financing, a buyer of residential real estate can skirt reporting requirements designed to ferret out fraud and doing so using a legal entity or trust allows that buyer to further obscure his identity. And this risk is present, FinCEN noted, for all covered transactions, including "[l]ow value non-financed transfers." Final Rule, 89 Fed. Reg. at 70,269. Moreover, FinCEN exempted from the reporting requirement a variety of non-financed residential real estate transactions involving legal entities and trusts that have a comparatively lower risk of abuse, such as those that follow from the death of the owner (*e.g.*, estate planning), are part of a divorce or bankruptcy, amount to a

transfer from an individual to a trust he created, or involve transfers to banks or other financial institutions. *Id.* at 70,290 (31 C.F.R. § 1031.320(b)(2)). FinCEN also provided empirical evidence of the risks posed by these transactions and the value of reporting to law enforcement. FinCEN explained that *42%* of reported transactions under its prior GTOs were linked with other suspicious activity reported under other reporting requirements. *Id.* at 70,260. And it identified more than a dozen illustrative cases or investigations. *Id.* at 70,259 n.12 (collecting cases). In fact, law enforcement used FinCEN's GTO information "to generate new investigative leads, identify new and related subjects in ongoing cases, and support prosecution and asset forfeiture efforts." *Id.* at 70,260. In the end, the GTOs proved so useful that law enforcement repeatedly requested those orders be expanded—addressing new regions and new transactions. *Id.*

Fidelity attempts to minimize this evidence, but its assertions are irrelevant and speculative. It is difficult to understand what Fidelity hopes to achieve by reducing the 21 cited law enforcement actions into a percentage of all covered transactions. *See* Br. 22, 46. Those examples do not tally all enforcement actions against covered transactions—much less any *investigation* into a *possible* violation of law *related* to a covered transaction. So the percentage Fidelity attempts to calculate does not even represent all "the transfers having any demonstrated connection to illegal activity." *See* Fidelity Br. 46. Nor would it be a meaningful number even if Fidelity could tabulate every law enforcement investigation into a covered transaction. Not every suspicious transaction

can be or will be investigated, not every investigation will uncover wrongdoing, and not every suspicious transaction will be related to an infraction that is worth pursuing.

Many of Fidelity's factual arguments proceed from the same error. A transaction does not need to "lead to any investigation" or result in "a determination of wrongdoing" for it to raise the specter of wrongdoing. Fidelity Br. 22. Instead, as even Fidelity admits, a transaction is suspicious if there is at least a "reason to suspect" that it relates to conduct that "might plausibly" be unlawful. Br. 20, 23-24 (quotation marks omitted). Thus, Fidelity is wrong to minimize the fact that *42%* of covered transactions have already been flagged as suspicious based entirely on the assertion that some SARs do not result in investigations. *See* Br. 22, 47-48.

Even so, that assertion is not consistent with the source Fidelity cites. *See* FinCEN, U.S. Dep't of the Treasury, *Year in Review for Fiscal Year 2024*, at 2-3), https://perma.cc/8BCX-BCQY (*FinCEN FY 2024*). Fidelity focuses on "FBI investigations," Br. 48, but ignores other agencies in the same report. As an example, 13.3% of IRS criminal investigations "originated from BSA data," like Suspicious Activity Reports. *FinCEN FY 2024*, at 2. And in a survey of BSA report users, 90% reported "open[ing] a new investigation or examination" based on those reports. *Id.* at 5. Suspicious activity reports are thus effective at uncovering potential criminal activity, and the connection between transactions flagged under the GTOs and other suspicious activity is strong evidence in support of the Final Rule.

Fidelity also attempts to minimize FinCEN's evidence because the "financial institutions" reporting other suspicious transactions may have been "overinclusive in their reporting out of an abundance of caution" or because "the rules governing those reports" might have "required institutions to be overinclusive." Br. 46-47 (quoting *Flowers*, 826 F. Supp. 3d at 820). That is entirely speculative; Fidelity identifies no evidence suggesting that financial institutions overreport suspicious transactions in other contexts not at issue in this case (or in the context of the GTOs). Nor did Fidelity (or the cited district court opinion) conduct any analysis of other reporting requirements or describe what reporting requirements it had in mind. Such speculation cannot be a basis to disregard an agency's considered judgment about the frequency with which transactions covered by the Rule are linked to other suspicious conduct indicative of money laundering or other crimes.

Finally, Fidelity suggests the 42% figure supports its case because the implication is that 58% of GTO transactions were not linked to other suspicious activity. But just because a transaction has not been linked to other suspicious activity outside the context of residential real estate does not mean that the transaction is not suspicious (or is lawful). After all, a significant purpose of the Final Rule's reporting requirement is to capture new suspicious transactions. If every GTO transaction (or covered transaction) had already been flagged, there would be little justification for the Final Rule.

The Final Rule here thus rests on far more than simply FinCEN's "experience," Fidelity Br. 44, but that experience is also relevant. As this Court has recognized, "[a]gencies are permitted to rely on their experience in the regulated field, so long as they explain what their experience is and how that experience informs the agency's conclusion"; such experience cannot be invoked "only when the agency fails to actually explain what that experience was and how that experience supports the promulgated regulation." *National Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1322 (11th Cir. 2021). FinCEN easily cleared that bar, explaining in detail its experience with GTOs, its law enforcement experience related to these transactions, and the aspects of its experience that made these transactions especially attractive to criminals. Final Rule, 89 Fed. Reg. at 70,258-60; *see also National Mining Ass'n*, 985 F.3d at 1322 (rejecting arbitrary-and-capricious challenge where agency had provided no "specific instances" of the problem the challenged rule sought to address). Particularly in conjunction with the evidence FinCEN provided, that is more than sufficient to articulate "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks omitted).

**2.** Fidelity separately takes issue with FinCEN's analysis of the Final Rule's costs and benefits. Br. 49-52. As discussed further below, that requirement attaches only to reporting requirements under 31 U.S.C. § 5318(g)(1) and thus would not be a basis to hold the Final Rule unlawful to the extent it is separately authorized by § 5318(a)(2).

But in any event, Fidelity offers no sound basis for undermining FinCEN's reasoned analysis.

Under the statutory text, before imposing a suspicious-transaction reporting requirement under 31 U.S.C. § 5318(g)(1), FinCEN must "consider" a variety of factors, including "national priorities established by the Secretary," the statutory "purposes" outlined in § 5311, and "the means by or form in which the Secretary shall receive such reporting," including the "burdens" on reporting persons and the "benefits derived by the means or form of reporting by Federal law enforcement agencies and the intelligence community in countering financial crime, including money laundering and the financing of terrorism." 31 U.S.C. § 5318(g)(5)(B); *see also id.* § 5318(g)(5)(D) (requiring streamlined reports in certain circumstances to reduce burdens). The relevant statutory purposes include "requir[ing] certain reports or records that are highly useful in" criminal investigations and preventing terrorism. *Id.* § 5311(1).

The statutory language does not even reference costs, much less require any "formal cost-benefit analysis" or obligate FinCEN to ensure that the quantified "benefits of [the Rule] outweighed its costs." *Center for Biological Diversity v. EPA*, 141 F.4th 153, 172 (D.C. Cir. 2025) (per curiam) (quotation marks omitted) (interpreting analogous language that required the Environmental Protection Agency to "consider" the "economic consequences" of its action (quotation marks omitted)); *see also Florida Manufactured Hous. Ass'n v. Cisneros*, 53 F.3d 1565, 1577 (11th Cir. 1995) (interpreting requirement for the Department of Housing and Urban Development to "consider the

probable effect of [its action] on the cost" of products (quotation marks omitted)). Instead, it was "up to [FinCEN] to decide how to account for cost" and benefits, and its effort to do so is subject only to deferential arbitrary-and-capricious review. *Center for Biological Diversity*, 141 F.4th at 172 (alteration omitted) (quoting *Michigan v. EPA*, 576 U.S. 743, 759 (2015)).

FinCEN more than met its burden to "consider" the benefits and burdens of the Final Rule. FinCEN explained that the Final Rule would "generate benefits by mitigating" use of the American residential real estate market to launder funds and the difficulty of determining who beneficially owns legal entities that acquire real estate. Final Rule, 89 Fed. Reg. at 70,278. In particular, the Rule makes "law enforcement investigations" into money laundering and terrorism "less costly and more effective," thereby generating "value by reducing the social costs associated with ... illicit activity." *Id.* FinCEN went on to explain how the Final Rule would provide benefits over and above the preexisting regulatory scheme. *Id.* at 70,279-80. Prior reporting requirements collected some transaction and beneficial-ownership information, *id.*, but none are as broad as the Final Rule, nor do they effectively "alert law enforcement to the fact that a residential real estate transfer fitting within a known money laundering typology has taken place," *id.* at 70,280. And FinCEN explained that the "ability to successfully detect, prosecute, and deter crimes—or other illicit activities that rely on money laundering to be profitable—is not readily translatable to dollar figures." *Id.* at

70,284-85. Thus, FinCEN did not attempt to provide a quantitative assessment of the "net benefit of the rule." *Id.* at 70,284.

On the other side of the ledger, FinCEN estimated the costs the Final Rule would impose. Specifically, according to a "conservative" estimate, the Final Rule will cost financial institutions "approximately $428.4 and $690.4 million (midpoint $559.4 million) in the first compliance year and between approximately $401.2 and $663.2 million (midpoint $532.2 million) (current dollar value) in subsequent years." Final Rule, 89 Fed. Reg. at 70,284. That cost estimate included "training costs," *id.* at 70,285-86; "costs associated with reporting," *id.* at 70,286; and "recordkeeping" costs, *id.* at 70,286-87. And FinCEN separately considered the annual "operating costs" the government would expend to implement the Final Rule, *i.e.*, "$8.5 million in the first year and approximately $7 million each year thereafter." *Id.* at 70,287.

FinCEN ultimately made clear its "expectation" that the Final Rule "will generate intangible benefits worth over $500 million per year," Final Rule, 89 Fed. Reg. at 70,285, and those significant benefits were sufficient to warrant the Final Rule. In offering this conclusion, FinCEN was not using its cost estimates to "do double duty as an implicit estimate of the benefits of the Rule." Br. 50. It instead offered its judgment that the generally "inestimable" benefits of the Final Rule were so substantial as to justify the Rule's significant costs.

Fidelity does not dispute that the Final Rule will have significant benefits. Instead, Fidelity primarily faults FinCEN for failing to "estimate"—*i.e.*, quantify—those benefits. But FinCEN was under no obligation to do so. It is commonplace for agencies to conclude, through rational analysis, that "hard-to-quantify benefits ... would exceed [a] rule's cost" without reducing those benefits to a number. *See, e.g.*, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 455 (5th Cir. 2021); *Investment Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) ("[T]he law does not require agencies to measure the immeasurable."); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) (declining to "insist" agencies "obtain[] the unobtainable"). FinCEN found the benefits of its rule could not be reduced to a dollar figure, and Fidelity offers no serious argument to the contrary.

Separately, Fidelity argues the district court erred by holding that "FinCEN was not required to conduct a cost-benefit analysis." Br. 51-52. But the district court explained that "[t]he statute directs agency consideration of costs and benefits." Dkt. 82, at 35-36. The district court simply recognized that the statutory text affords FinCEN discretion in "*how* ... to consider [those] factor[s]." *Id.* at 36 (quoting *Cisneros*, 53 F.3d at 1577). FinCEN reasonably exercised that discretion.

Finally, Fidelity's reliance on *Novedades Y Servicios, Inc. v. Financial Crimes Enforcement Network*, 181 F.4th 961 (9th Cir. 2026), is misplaced. There, FinCEN had issued a GTO that was applicable to certain money-services businesses along the southwest border of the United States. *Id.* at 967. In the relevant Federal Register

publication, FinCEN had not included any "mention" of "the cost of compliance or any burden the ... GTO might impose on regulated" entities, and there was no record evidence "that FinCEN ... consider[ed] the cost of compliance." *Id.* at 975. Here, by contrast, the Final Rule includes a detailed consideration of the burdens and benefits of the Final Rule.

**3.** Fidelity's other two challenges to the district court's conclusion that the Final Rule is not arbitrary and capricious likewise fail. First, Fidelity argues that the district court improperly deferred to the magistrate judge's analysis. Br. 36-37. That is wrong and irrelevant: the district court "thoroughly reviewed the record and Plaintiffs' argument," Dkt. 91, at 3, and ultimately "adopted and confirmed" the magistrate judge's analysis, making it "a part of [the district court's] Order," *id.* at 1, 12 (citation modified), and in any event, any error on that score would make no difference on appeal because this Court "in effect" conducts "a direct review of the agency's decision under the APA," Br. 14 (citing *Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1306 (11th Cir. 2021)).

Second, Fidelity faults the district court's recitation of this Court's own distinction between the "arbitrary-and-capricious standard" and the "substantial-evidence standard" in the APA. *See* Dkt. 82, at 2 n.1 (discussing *Lopez-Martinez v. U.S. Att'y Gen.*, 149 F.4th 1202, 1207 (11th Cir. 2025)). As this Court explained, "the substantial-evidence standard" applies only to "'formal' agency action[s]," *Lopez-Martinez*, 149 F.4th at 1207, not the informal rulemaking at issue here. Still, as Fidelity recognizes, there is no "*substantive* difference" between the two standards. Br. 39

(quoting *Lopez-Martinez*, 149 F.4th at 1207). So when the district court upheld the Final Rule under the arbitrary-and-capricious standard, it necessarily found substantial evidence supporting the Rule.

## III. The Final Rule Is Consistent with the Fourth Amendment

Lastly, Fidelity argues the Final Rule would violate the Fourth Amendment even if it were authorized under the statutory text or that Fourth Amendment doubts counsel a narrow reading of the statutory text. But as the district court explained, *see* Dkt. 91, at 10-12, the Supreme Court's decision in *Shultz*, 416 U.S. 21, forecloses this argument. Even assuming that reporting requirements are "searches" under the Fourth Amendment and that Fidelity has Fourth Amendment rights, the requirements here do not violate the Fourth Amendment. *Cf. Shultz*, 416 U.S. at 58-70; *see Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (noting that constitutional-avoidance canon applies only when the statute at issue is ambiguous and one interpretation would raise "serious" constitutional doubt).

In *Shultz*, the Supreme Court rejected a Fourth Amendment challenge to other reporting requirements imposed under the BSA. *See Shultz*, 416 U.S. at 58-70. As especially relevant here, the Act allows the Secretary to impose reporting requirements for certain currency transactions, *see* 31 U.S.C. § 5313, and the Secretary has used that authority to require financial institutions to report domestic currency transactions over $10,000. 31 C.F.R. § 103.22 (1974); *see also* 31 C.F.R. § 1010.311 (present-day reporting requirement). More than 50 years ago, the Supreme Court rejected a Fourth

Amendment challenge to that regulation, explaining that "organizations engaged in commerce" have long been required to "file reports dealing with particular phases of their activities" without running afoul of the Fourth Amendment. *Shultz*, 416 U.S. at 65. Those organizations do not have "an unqualified right to conduct their affairs in secret" and are thus subject to reasonable reporting requirements. *Id.* at 67 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)). The regulation at issue in *Shultz* was reasonable because it required disclosure of information that had been "sufficiently described" and was "limited," reaching only the parties' identities and the relevant transactions' details. *Id.*

Indeed, governments routinely create similar reporting requirements. Even aside from reporting requirements for cash transactions exceeding certain thresholds, 26 U.S.C. § 6050I; 31 U.S.C. §§ 5313, 5314, federal law requires taxpayers to file tax returns and various entities to file tax information returns, 26 U.S.C. §§ 6012, 6031-6060; employers to collect and make available information about new employees' eligibility to work, *see* 8 U.S.C. § 1324a; and political campaigns to report contributions and expenditures, *see* 52 U.S.C. § 30104. At the state and local level, lawmakers have implemented many other reporting requirements. *See, e.g.*, *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 577 (6th Cir. 2002) (recognizing that a public employee was unlikely to succeed on a Fourth Amendment challenge to financial disclosure requirements); *Barry v. City of New York*, 712 F.2d 1554, 1564 (2d Cir. 1983) (similar). The government is unaware of any case from this or any other circuit casting

doubt on the constitutionality of such requirements, and Fidelity has identified none. As the Supreme Court has explained, "reporting requirements are by no means per se violations of the Fourth Amendment," and "a contrary holding might well fly in the face of the settled ... history of self-assessment of individual and corporate income taxes in the United States." *Shultz*, 416 U.S. at 59-60.

Recently, this Court applied *Shultz* when upholding another provision in the BSA against Fourth Amendment challenges. *National Small Bus. United v. U.S. Dep't of the Treasury*, 161 F.4th 1323 (11th Cir. 2025), *petition for cert. filed*, No. 25-1201 (U.S. Apr. 15, 2026). That case involved "a federal law requiring corporations to report information about their owners"—the Corporate Transparency Act (CTA). *Id.* at 1326. Congress had "found that bad actors have been using the anonymity of the corporate form to commit financial crimes, such as money laundering and financing terrorism," and based on that finding, it required corporations to report their "beneficial owners." *Id.* As this Court explained, the CTA does not violate the Fourth Amendment. *Id.* at 1333-34. There was nothing arbitrary or discretionary about its application, and the information the statute required was sufficiently described, limited, and "no more detailed than the reports in *Shultz*." *Id.* at 1334.

The Final Rule here is no different. It imposes a reporting requirement on "organizations engaged in commerce," *i.e.*, the financial institutions that may qualify as a reporting person under that Rule. *See* Final Rule, 89 Fed. Reg. at 70,291-92. And the reports required under the rule seek basic information about the parties to the

transaction (including details about any trust or entity, like its beneficial owners), the property in question, and the amount and method of payment(s) for the transaction. *See id.* at 70,291-92. These reports are not meaningfully different from the Currency Transaction Reports that *Shultz* allowed, and Fidelity does not offer a colorable argument to the contrary. *See* Br. 55 (only counting number of fields, without any comparison to other reports).

Fidelity primarily claims the Final Rule "does not seek information relevant to unlawful activities and it is not narrowly tailored to obtain only such information." Br. 53-54. That simply rehashes Fidelity's statutory-authority arguments. As explained, the Final Rule addresses a defined class of transactions that Fidelity does not dispute are attractive to criminals. That is more than sufficient to satisfy any required nexus to unlawful conduct. *See Shultz*, 416 U.S. at 67 (rejecting Fourth Amendment challenge because reporting requirement was "sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

GREGORY W. KEHOE
*United States Attorney*

BRAD HINSHELWOOD

*s/ J. Kain Day*
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4214*

*Of Counsel:*

JONATHAN BRESSLER
*Assistant General Counsel for Enforcement and Intelligence*

CAITLIN COTTINGHAM
*Principal Deputy Assistant General Counsel for Enforcement and Intelligence*

SEAN BOYCE
*Chief Counsel for the Financial Crimes Enforcement Network*

*U.S. Department of the Treasury*

September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,959 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ J. Kain Day*
J. Kain Day

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ J. Kain Day*
J. Kain Day

**ADDENDUM**

## TABLE OF CONTENTS

31 U.S.C. § 5318(a)(2) .......... A1

31 U.S.C. § 5318(g)(1) .......... A2

**31 U.S.C. § 5318(a)(2)**

**§ 5318. Compliance, exemptions, and summons authority**

(a) **General Powers of Secretary.—**The Secretary of the Treasury may (except under section 5315 of this title and regulations prescribed under section 5315)—

. . .

> (2) require a class of domestic financial institutions or nonfinancial trades or businesses to maintain appropriate procedures, including the collection and reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering, the financing of terrorism, or other forms of illicit finance; . . . .

**31 U.S.C. § 5318(g)(1)**

**§ 5318. Compliance, exemptions, and summons authority**

. . .

**(g) Reporting of Suspicious Transactions.—**

**(1) In general.—**

The Secretary may require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation. . . . .